**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| S.A.M. PANTAENIUS MONACO a/s/o MY SENSES, LLC,<br>Plaintiff,<br><br>v.<br><br>SAVE ON TRANSPORT ENTERPRISES, LLC; GREEENTREE TRANSPORTATION CO., INC.; SAFE TOW LLC; SMARK TALK TRANSPORT CORP., dba STT LOGISTICS GROUP; AND JONES MOTOR CO., INC.,<br>Defendants. | ) | C.A. No. 1:25-cv-140-MRD-PAS |

**MEMORANDUM AND ORDER**

Melissa R. DuBose, United States District Judge.

This case concerns the doomed transcontinental voyage of a 2018 SCAT/Gunboat G4 Catamaran (the "Vessel"). The plaintiff, S.A.M. Pantaenius MONACO a/s/o My Senses, LLC ("Pantaenius"), is the subrogor of the Vessel's owner, My Senses, LLC ("My Senses"), who sought to have the Vessel shipped overland from Rhode Island to California. ECF No. 18 ¶¶ 12–15. The defendants are Save on Transport Enterprises, LLC ("Save On"), Greentree Transportation Co., Inc. ("Greentree"), Safe Tow LLC ("Safe Tow"), Smart Talk Transport Corp., dba STT Logistics Group ("STT"), and Jones Motor Co., Inc. ("JMC"). Pantaenius sued each of the defendants for their alleged roles in the Vessel's fiery end.

Before the Court are the Partial Motions to Dismiss filed by most defendants; namely, Greentree and JMC (ECF No. 20), Save On (ECF No. 24), and Safe Tow (ECF No. 30). These defendants contend that Pantaenius's state law claims are preempted by either the Carmack Amendment, 49 U.S.C. § 14706, or the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 14501. For the following reasons, the Court largely agrees, and (1) GRANTS Greentree and JMC's Motion; (2) GRANTS Save On's Motion; and (3) GRANTS IN PART Safe Tow's Motion.

## I. BACKGROUND

As alleged in Pantaenius's Second Amended Complaint, the sequence of events that ultimately left the Vessel a charred hulk began when My Senses contracted with Save On to broker the Vessel's transport from Hinckley Marina in Portsmouth, Rhode Island to Alameda, California. ECF No. 18 ¶¶ 15–18. Save On, in turn, contracted with Safe Tow to act as the Vessel's carrier. *Id.* ¶¶ 19–28. The contract between Save On and Safe Tow provided that the latter was, *inter alia*, not to "re-broker, assign or interline" shipment of the Vessel. *Id.* (quoting ECF No. 19-3 at 8). That contract also required Safe Tow to furnish a certificate demonstrating a certain amount of insurance coverage for the shipment. ECF No. 19-3 at 10–11.

Without furnishing proof of the required amount of insurance, Safe Tow embarked on its effort to ship the Vessel across the country. ECF No. 18 ¶¶ 28–29 (citing ECF No. 19-4). This venture foundered, however, when Safe Tow's driver determined that his trailer was insufficient to bear the Vessel. *Id.* ¶ 30. Safe Tow thus scuttled its plans to act as the Vessel's carrier.

What happened next is the matter of some dispute between the parties. In its Second Amended Complaint, Pantaenius presents two alternative factual scenarios. In the first scenario, Safe Tow re-brokered shipment of the Vessel to another carrier, Greentree, without informing Save On. *Id.* ¶¶ 31–32. Greentree then sent its own driver, Labre "Breeze" Hall, to load the Vessel onto a tractor-trailer. *Id.* ¶ 34. This proved to be anything but a "breeze" for Mr. Hall, who apparently spent several days loading the Vessel onto his vehicle. *Id.* ¶ 35.

Once he had finally done so, Mr. Hall began the cross-country venture with the Vessel in tow. *Id.* ¶ 36. This voyage swiftly ran aground, however, when Mr. Hall pulled over to the side of the road in a neighborhood only about one mile from the Vessel's berth at Hinckley Yard. *Id.* There, Mr. Hall mutinied against the terms of the agreement between Greentree and Safe Tow, refusing to move the Vessel any further unless Safe Tow agreed to pay Greentree an amount higher than previously agreed. *Id.* ¶¶ 36–38. When Safe Tow refused to parley, Mr. Hall took an Uber to a local motel, leaving his tractor-trailer and the Vessel marooned in Portsmouth. *Id.*

While the Vessel remained unattended overnight, calamity struck. Sometime in the early hours of the morning, the Vessel was consumed by a fire that all but burnt it down to its waterline. *Id.* ¶ 41. The Rhode Island Division of State Fire Marshal who inspected the cause of the inferno was unable to determine whether it was caused by the Vessel's lithium batteries or by "open flame." *Id.* ¶ 42 (citing ECF

No. 19-6).[1] Regardless, it was a total loss. *Id.* ¶ 41. The Vessel's final voyage had, quite literally, gone up in smoke.

The second scenario is Greentree's account of events, presented in the alternative in Pantaenius's Second Amended Complaint. According to Greentree, Safe Tow's driver was the one who demanded more money from Save On, not Greentree's driver. *Id.* ¶ 54. In this scenario, Save On re-brokered the shipment of the Vessel to STT, who then re-brokered shipment to JMC, who then brokered transportation to Greentree. *Id.* ¶¶ 55–58. Pantaenius's Second Amended Complaint does not explain why, in this scenario, Greentree's driver left the Vessel unattended, but the result was ultimately the same: total loss of the Vessel to a mysterious inferno.

Pantaenius paid My Senses approximately $1,000,000 for the loss of the Vessel. *Id.* ¶ 51. Pantaenius then sued all five defendants, alleging twenty-three counts related to the Vessel's destruction. *Id.* ¶¶ 61–200.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a case for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state

---

[1] Pantaenius alleges that the particular kind of lithium batteries stored aboard the Vessel are "incombustible" and instead appears to emphasize the Vessel's unsecure location, perhaps implying that the Vessel received the same treatment from troublemaking Rhode Islanders as did the HMS *Gaspee* two-and-a-half centuries prior. *See generally* Rhode Island Department of State, *The Burning of the Gaspee*, https://www.sos.ri.gov/divisions/civics-and-education/for-educators/themed-collections/gaspee [https://perma.cc/4E88-GYLJ].

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). To determine whether a complaint states a legal claim that is plausible on its face, the court engages in a two-step inquiry. First, the court "sifts[s] through the averments in the complaint," and "separat[es] conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citing *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). Second, the court determines whether the remaining factual content "gives rise to a plausible claim to relief." *Id.* (citing *Morales-Cruz*, 676 F.3d at 224).

## III. DISCUSSION

The defendants' Partial Motions to Dismiss largely rely on the same two arguments against most of Pantaenius's claims. First, those defendants who are alleged to have acted as motor carriers (Greentree and, as disputed by the parties, Safe Tow) contend that all Pantaneius's state-law claims against them are preempted by the Carmack Amendment to the Interstate Commerce Act. Second, those defendants who are alleged to have acted as transportation brokers (Save On, JMC, and, as disputed by the parties, Safe Tow) argue that all Pantaenius's claims against them are preempted by the Federal Aviation Administration Authorization Act ("FAAAA").[2]

[2] Save On and Safe Tow's Partial Motions to Dismiss (ECF Nos. 24 and 30) were filed over fourteen days after Pantaenius's Second Amended Complaint, past the deadline for responses to amended pleadings under Fed. R. Civ. P. 15(a)(3).

The Court addresses each of these issues in turn.

### A. The Carmack Amendment Preempts all State Law Claims Against Defendants Acting as Carriers

"The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707, passed in 1906 as part of the Hepburn Act, governs the liability of carriers for lost or damaged goods." *Rini v. United Van Lines, Inc.*, 104 F.3d 502, 503 (1st Cir. 1997) (internal citation omitted). It "effectively creates a federal statutory remedy on the bill of lading against both the originating and destination carrier." *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 17 (1st Cir. 2003); *see also York v. Day Transfer Co.*, 525 F. Supp. 2d 289, 297 (D.R.I. 2007) ("The Carmack Amendment 'provides shippers with the statutory right to recover for actual losses or injuries to their property caused by carrier involved in the shipment.'"). In exchange for "impos[ing] something close to strict liability upon originating and delivering carriers," *Rankin*, 336 F.3d at 9, the Carmack Amendment limits recovery to "actual loss or injury." *See* 49 U.S.C. § 14706(a)(1); *Rankin*, 336 F.3d at 16; *see also PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 588 (1st Cir. 1988) ("The Carmack Amendment was enacted to 'relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'") (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)).

---

Pantaenius asks the Court to strike Save On's Motion as untimely. *See* ECF No. 29 at 3–4. But given the lack of prejudice to Pantaenius posed by that Motion's tardiness, the Court declines to do so.

"The preemptive effect of the Carmack Amendment over state law governing damages for the loss or damage of goods has been reiterated by the Supreme Court in many cases and is well established." *Rini*, 104 F.3d at 504. With few exceptions, it "provide[s] the exclusive cause of action for loss or damage to goods arriving from the interstate transportation of those goods by a common carrier." *York*, 525 F. Supp. 2d at 298 (quoting *Harris v. Crown Moving*, No. 07–CV–126–JLQ, 2007 WL 1724299, at *2 (E.D. Wash. June 14, 2007)). "Preempted state law claims, therefore, include all liability stemming from damage or loss of goods, liability stemming from the claims process, and liability related to the payment of claims." *Rini*, 104 F.3d at 506.

The Interstate Commerce Act ("ICA") defines a motor carrier as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). "Transportation," in turn, is defined as including:

> (A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and
>
> (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

*Id.* § 1302(23). While this above definition is broad, a federal regulation clarifies that "motor carriers . . . are not brokers . . . when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." 49 C.F.R. § 371.2(a).

"When analyzing whether an entity operated as a carrier, courts look to how the party acted during the 'specific transaction' at issue, which includes 'the understanding among the parties involved [and] consideration of how the entity held itself out.'" *Richwell Grp., Inc. v. Seneca Logistics Grp., LLC*, 425 F. Supp. 3d 57, 61 (D. Mass. 2019) (quoting *ASARCO LLC v. England Logistics Inc.*, 71 F. Supp. 3d 990, 998 (D. Ariz. 2014)). "[O]ther courts have found that a party is a carrier in a 'specific transaction' if it takes responsibility for a shipment, whether or not it performed the actual transportation or labels itself as a broker." *Id.* (collecting cases).

Here, Pantaenius alleges thirteen claims against Greentree and Safe Tow. ECF No. 18 ¶¶ 99–182. Of these claims, two are brought under the Carmack Amendment (Counts IX and XVI, against Greentree and Safe Tow respectively), while the remaining eleven involve state-law causes of action for breach of third-party beneficiary contract (Counts VII and XIV), breach of bailment obligations (Counts VIII and XV), negligence (Counts X and XVII), gross negligence (Counts XI and XVIII), fraud (Count XII), and conversion (Counts XIII and XIX). Greentree and Safe Tow contend that Pantaenius's state law claims against them are preempted by the Carmack Amendment because they were acting as motor carriers with respect to the Vessel. ECF Nos. 20-1 at 10–14; 30-1 at 3–9.

In response, Pantaenius does not dispute the general preemptive force of the Carmack Amendment. Instead, it argues that Carmack preemption is inapplicable here for three reasons: first, Pantaenius contends that all its claims against Greentree and Safe Tow pertain to conduct outside the period of "transportation"

covered by the Carmack Amendment; second, it argues that its conversion claims fall within an exception to preemption that supposedly applies to "traditional true conversion claims," *see Tran Enterprises, LLC v. DHL Exp. (USA), Inc.*, 627 F.3d 1004, 1009 (5th Cir. 2010); and third, it claims that disputes of material fact as to Safe Tow's status as a carrier—as opposed to a broker—preclude dismissal of its state law claims against it. *See* ECF Nos. 23 at 4–9; 33 at 3–8.

Pantaenius's first counterargument is creative but unavailing. Essentially, Pantaenius contends that once the Vessel's carrier stranded it in Portsmouth, the Vessel was no longer "in transportation" within the meaning of the ICA, and that the carrier's conduct therefore falls outside the scope of the Carmack Amendment. *See* ECF No. 23 at 8. While it is true that the Vessel was, at that point, no longer physically *moving*, the ICA's definition of transportation encompasses a wide range of "services related to th[e] movement" of property. *See* 49 U.S.C. § 13102(14)(B). Pantaenius provides meager support for its suggestion that this broad definition would not include the kind of pause in the Vessel's journey alleged here. *See Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196 (1916) (explaining that the Carmack Amendment is "comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to *any part* of the agreed transportation") (emphasis added).

Pantaenius's second counterargument fares no better. It is true that courts have sometimes applied an exception to the Carmack Amendment in cases involving true conversion of property. *See Glickfeld v. Howard Van Lines, Inc.*, 213 F.2d 723,

727 (9th Cir. 1954); *cf. Kemper Ins. Cos. v. Fed. Exp. Corp.*, 252 F.3d 509, 515 (1st Cir. 2001) ("[I]f the property has been converted by the carrier, it would be against public policy to permit the carrier to limit its liability and thus to profit from its own misconduct.") (quoting *Glickfeld*, 213 F.2d at 727) (alteration in original). But this exception applies to the Amendment's liability-limiting provisions, and not its preemptive force. *See Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 337–38 (3d Cir. 2014) (explaining the distinction). Thus, even if Pantaenius has plausibly alleged the carrier wholly converted the Vessel to its own use, that conversion claim remains preempted by the Carmack Amendment.[3]

As Pantaenius's first two counterarguments are its only defenses against Carmack preemption of its state law claims against Greentree, those claims must be dismissed. However, its third counterargument—that Safe Tow may have been acting as a broker, not a carrier—bears more weight. Safe Tow's exact role in the Vessel's transportation is a matter of dispute between the parties, as evidenced by the alternative scenarios Pantaenius presents in its Second Amended Complaint. *See* ECF No. 18 ¶¶ 12–60. Whether Safe Tow was acting as a carrier or a broker depends on that role, including the extent to which it held itself out as a carrier and to which

[3] "In order for a conversion to be a 'true conversion,' the carrier must have 'appropriated the property for its own use or gain.'" *Certain Underwriters*, 762 F.3d at 337 n.5 (quoting *Glickfeld*, 213 F.2d at 727). It is unlikely that a carrier's refusal to continue shipping property absent additional compensation plausibly constitutes true conversion of that property.

it took responsibility for shipment of the Vessel. *See Richwell Grp.*, 425 F. Supp. 3d at 61.

The Court's present task is not to resolve this factual question. Instead, the Court must determine whether Pantaenius's factual allegations, taken as true, give rise to a viable claim against Safe Tow. Because Pantaenius plausibly alleges facts suggesting that Safe Tow could have either been a carrier or a broker, *see id.*, dismissal of Pantaenius's state law claims based on its status as a carrier will not be justified unless those same claims would also be dismissed if it was a broker.

### B. The FAAAA Preempts all State Law Tort Claims Against Defendants Acting as Brokers

Congress enacted and subsequently amended the FAAAA to address continued problems posed by state regulation of motor carriers and other transportation industry actors. *See generally Montgomery v. Caribe Transport II, LLC*, 146 S. Ct. 1199, 1203 (2026). Under the FAAAA, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). This provision preempts most state law claims against transportation brokers—the transportation industry's "matchmakers," who connect sellers of goods to the carriers who move them. *See Montgomery*, 146 S. Ct. at 1202.

That said, "[w]hile the FAAAA's preemptive effect is broad, it is not unlimited." *New Hampshire Motor Transport Ass'n v. Rowe*, 448 F.3d 66, 80 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008). Relevant here, § 14501(c)(2)(A) contains an exception (the

"safety exception") that provides that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." Further, courts have generally found that the FAAAA does not preempt state law breach of contract claims. *See, e.g.*, *Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.*, 972 F. Supp. 665, 671–73 (N.D. Ga. 1997); *Barber Auto Sales, Inc. v. United Parcel Services, Inc.*, 494 F. Supp. 2d 1290, 1293 (N.D. Ala. 2007); *Custom Stud, Inc. v. Meadow Lark Agency, Inc.*, 566 F. Supp. 3d 950, 954 (D. Minn. 2021); *Mrs. Ressler's Food Products v. KZY Logistics, LLC*, No. CV 2:17-02013, 2017 WL 3868703, at *3 (D.N.J. Sept. 5, 2017).[4]

Here, Pantaenius asserts fifteen claims against the defendants it alleges acted as brokers: Save On, STT, JMC, and (in the alternative) Safe Tow. ECF No. 18 ¶¶ 61–143, 183–200. These state law claims are for breach of contract (Count I), breach of bailment obligations (Counts II, VIII, XV, XX, and XXII), negligence (Counts III, X, XXI, and XXIII), gross negligence (Counts IV and XI), false advertising (Count V), unfair trade practices under R.I. Gen. Laws § 6-13.1-1 *et seq.*, breach of third-party beneficiary contract (Count VII), fraud (Count XII), and conversion (XIII). Save On,

---

[4] The Supreme Court determined in *American Airlines, Inc. v. Wolens* that "routine breach of contract claims" are not preempted by the Airline Deregulation Act ("ADA") because those claims seek only enforcement of "privately ordered obligations" and thus do not constitute state regulation within the meaning of the ADA. *See* 513 U.S. 219, 228–29 (1995). The FAAAA's preemption provisions use similar language to those in the ADA, and courts draw upon ADA precedent when analyzing FAAAA preemption. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 256 (2013); *New Hampshire Motor Transport Ass'n v. Rowe*, 448 F.3d 66, 75 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008) ("Therefore, in addition to cases interpreting the FAAAA, we look to cases interpreting the Airline Deregulation Act.").

JMC, and Safe Tow contend that, apart from Counts I and VII, all claims against them are preempted by the FAAAA. ECF Nos. 20-1 at 14–20; 24-1 at 8–16; 30-1 at 10–13.[5]

Pantaenius does not oppose dismissal of its false advertising and unfair trade practices claims against Save On (Counts V and VII). ECF No. 29 at 5. Its defense of most of its other claims largely centers around the safety exception to the FAAAA: in essence, it contends that its breach of bailment obligations, negligence, gross negligence, and conversion claims all implicate state safety regulations because they pertain to the obligation of the defendant brokers to ensure that the Vessel's carriers safely bore it across the country. ECF Nos. 23 at 9–13; 29 at 6–10; 33 at 8–9; *see also* ECF No. 38 at 2–8 (supplemental briefing on this issue). It thus seeks to characterize these claims as, at their core, involving the defendant brokers' negligent hiring of whichever carrier was ultimately responsible for the Vessel's unexplained combustion.

The Supreme Court recently confronted the question of whether negligent hiring claims against transportation brokers can fall within the safety exception to FAAAA preemption. *Montgomery*, 146 S. Ct. at 1204. In *Montgomery v. Caribe*, the petitioner sued the respondent for negligently hiring an unsafe carrier who struck

---

[5] Despite also having acted as an alleged broker, STT has not filed its own Motion to Dismiss. Federal preemption is generally an affirmative defense for which the defendant bears the burden of proof. *See In re Zofran (Ondansetron) Products Liab. Litig.*, 57 F.4th 327, 336 (1st Cir. 2023) (citing *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 313 (2019)). As such, the following discussion of FAAAA preemption applies only to those defendants who have invoked it as grounds for dismissal.

the petitioner while the petitioner was stopped on the side of a road, resulting in severe and permanent injuries physical injuries. *Id.* at 1203–04. In considering the safety exception's reach, the Supreme Court explained that "[a]ll agree that common-law duties and standards of care form part of a State's authority to regulate safety." *Id.* at 1204. Thus, because common law negligent hiring claims "impose a duty of reasonable care in employing a contractor for work carrying a risk of physical harm," those claims fall within the safety exception so long as they are claims "with respect to motor vehicles." *Id.*

A careful reading of *Montgomery* indicates that not all negligent hiring claims against brokers inherently fall within the safety exception. The Supreme Court identified the preemption question as being "whether negligent-hiring claims *of the type Montgomery presses* are claims 'with respect to motor vehicles.'" *Id.* (emphasis added); *see also Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 456 (1st Cir. 2014) (explaining that Supreme Court precedent "calls for an individualized assessment of the facts underlying each case to determine whether a particular state-law claim will have a forbidden effect" when analyzing preemption). Further, when addressing counter-arguments, the Supreme Court explained that its reading of the safety exception does not "swallow the FAAAA's express preemption provision whole" because "[t]he safety exception saves only a small subset of preempted claims: those involving regulations concerning motor vehicle safety." *Montgomery*, 146 S. Ct. at 1205 (citing 49 U.S.C. § 14501(c)).

The Supreme Court's analysis in *Montgomery* instead suggests that whether a claim is "with respect to motor vehicles"—i.e., whether it "'concerns' or 'regards' the vehicles used in transportation"—depends on the specific factual allegations underpinning that claim. *See id.* In *Montgomery*, the negligent hiring claim alleged that the broker "failed to exercise reasonable care when it hired Caribe Transport, which had a subpar safety rating from federal regulators, to transport goods via truck." *Id.* The claim alleged that the broker should have known that choosing this carrier "was reasonably likely to cause an accident" and that it therefore "'concern[ed] motor vehicles—most obviously, the trucks that will transport the goods." *Id.* The Supreme Court determined that claim fell within the FAAAA's safety exception and was thus not preempted. *Id.*

Here, Pantaenius's breach of bailment obligations, negligence, gross negligence, and conversion claims do not allege similar facts directly related to motor vehicle safety. Pantaenius does not claim that the defendant brokers negligently hired any accident-prone or otherwise unsafe carriers; instead, it alleges that the carriers were not "trustworthy" or "competent to transport" the Vessel, that they were not "sufficiently insured," and that they failed to care for the property entrusted to them in their capacities as bailees. *See, e.g.*, ECF No. 18 ¶¶ 68–85. While it is possible—as Pantaenius argues in its supplemental briefing on this issue, *see* ECF No. 38—that the fire that consumed the Vessel may have posed a risk to other motorists, nowhere in its Second Amended Complaint does Pantaenius allege that the trailer carrying the Vessel was illegally or otherwise improperly parked in a way

that negligently endangered motor vehicle safety, as opposed to security of the Vessel itself. *See EFL Glob. LLC v. Uber Freight LLC*, No. 25-CV-07214-CRB, 2026 WL 899423, at *7 (N.D. Cal. Mar. 31, 2026) (finding the safety exception inapplicable to cargo theft claims, explaining that "[r]eading the safety exception broadly to encompass any state law claim with some connection to motor vehicles or cargo brokerage could risk restoring the pre-FAAAA status quo, in contrast with Congress's intent").

Apart from its attempt to invoke the safety exception, Pantaenius makes two other attempts to salvage its state law claims against the broker defendants: first, as with its defense against Carmack preemption, it contends that its claims pertain to conduct outside the actual transportation of the Vessel; second, and confusingly, it posits that its fraud claim against Safe Tow (Count XII) "as plead is a breach of third-party beneficiary contract claim" and is therefore not preempted by the FAAAA. ECF Nos. 29 at 10–11; 33 at 8–13. Both arguments are meritless. With respect to the first, as with the ICA, there is little reason to think that "transportation of property" within the meaning of the FAAAA does not include the conduct alleged here. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 262 (2013) ("Temporary storage of an item in transit en route to its final destination relates to the movement of property and therefore fits within [the FAAAA]'s definition.") (citing 49 U.S.C. § 13012(23)(B)). As for the second argument, Count XII in the Second Amended Complaint—captioned "FRAUD"—clearly lays out the elements for a state law claim for false representation by Safe Tow, as opposed to Count VII, which is expressly for

breach of third-party beneficiary contract. *See* ECF No. 18 ¶¶ 99–103, 130–36. As Count XII alleges a claim related to broker services regarding the transportation of property, and as that claim does not fall within the FAAAA's safety exception, that claim is clearly preempted. *See Fahrenbach v. Green Planet Movers*, 682 F. Supp. 3d 109, 112 (D. Mass. 2023) (dismissing state law fraud claims after explaining that "[a] survey of [the First Circuit] and numerous sister circuits reinforces the contention that the FAAAA has broad preemptive effect and generally warrants the dismissal of tort claims based on state law").

Having concluded that the FAAAA preempts most of Pantaenius's state law claims against those defendants alleged to have acted as brokers, the Court returns to the issue posed by the dispute over Safe Tow's status as either carrier or broker. As noted previously, to the extent Safe Tow is alleged to have been a carrier, all Pantaenius's state law claims against it are preempted by the Carmack Amendment. Now, based on the foregoing analysis, the Court has determined that, to the extent Safe Tow is alleged to have been a broker, all Pantaenius's state law claims against it other than its breach of third-party beneficiary contract claim (Count VII) are preempted by the FAAAA. Taken together, this means that regardless of whether Safe Tow was a carrier or a broker, the only state law claim against it that is not preempted by both the Carmack Amendment and the FAAAA is Count VII. Thus, that claim is the only one that survives Safe Tow's Partial Motion to Dismiss.

## IV. CONCLUSION

For the foregoing reasons, the Court: (1) GRANTS Greentree and JMC's Partial Motion to Dismiss (ECF No. 20); (2) GRANTS Save On's Partial Motion to Dismiss (ECF No. 24); and (3) GRANTS Safe Tow's Partial Motion to Dismiss (ECF No. 30) with respect to Count VIII and Counts X through XIII of Pantaenius's Second Amended Complaint but DENIES it with respect to Count VII. In other words, Pantaenius may proceed only on the following claims: Count I (Carmack Amendment claim, against Save On); Count VII (breach of third-party beneficiary contract, against Safe Tow); Count IX (Carmack Amendment claim, against Safe Tow); Count XVI (Carmack Amendment Claim, against Greentree); Count XX (breach of bailment obligations, against STT); and Count XXI (negligence, against STT).

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge

August 14, 2026